J-S50033-16

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| A.V. | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellee | |
| v. | |
| A.M. | |
| Appellant | No. 217 MDA 2016 |

Appeal from the Order Entered January 4, 2016
In the Court of Common Pleas of Dauphin County
Civil Division at No(s): 2014 CV 3436 CU

BEFORE:  MUNDY, J., STABILE, J., and FITZGERALD, J.[*]

MEMORANDUM BY MUNDY, J.:                    **FILED JULY 20, 2016**

Appellant, A.M. (Father), appeals from the December 3, 2015 custody order, as amended by the January 4, 2016 order granting his motion for reconsideration, and modifying the trial court's December 3, 2015 custody order.  In its December 3, 2015 order, the trial court awarded primary physical custody of Father's minor son, L.V., to his mother, A.V. (Mother).  In addition, the order awarded Father partial physical custody of L.V., and awarded both parents shared legal custody.  After careful review, we affirm.

The trial court summarized the factual and procedural history of this matter as follows.

_____

[*] Former Justice specially assigned to the Superior Court.

The parties are the parents of a son, L.V., born in July 2007. Father had limited pre-natal involvement with Mother but following [L.V.'s] birth denied paternity. Paternity was established by testing a few months later and Father [was] ordered to pay child support. Father met [L.V.] for the first time in February 2012 when he was four years and seven months old. Prior thereto, [L.V.] was raised by Mother, who lived with her parents. In March 2012, Mother and Father rekindled their relationship during which time Mother suspended child support and cancelled Father's arrears. Their renewed relationship ended in September 2012 at which time Father and paternal grandmother continued visiting [L.V.] by mutual agreement. From sometime in the spring of 2013 through September 2013, Father agreed to take custody of [L.V.] every weekend while Mother worked. They later mutually agreed to reduce Father's custody to every other weekend (Thursday evening through Sunday) plus a Thursday overnight on Father's off weekend.

On April 15, 2014, Mother filed a *pro se* custody complaint and emergency petition seeking primary physical custody and also seeking a temporary order limiting Father's custody. The parties previously agreed that Father could take [L.V.] to Disney World in April. A few days prior to the trip, Mother became concerned Father would not return [L.V.] because he had allegedly threatened to retain custody and had not provided Mother with a trip itinerary. Mother also noted Father made numerous accusations to Dauphin County Children & Youth Services (CYS) about the living conditions in her home which she claimed were proven unfounded. Her emergency request for temporary custody was denied by the Hon[orable] Bruce Bratton; however, the parties, with the help of counsel, were able to agree to a temporary custody schedule [on] April 15, 2014, under which terms [L.V.] would travel with Father to Disney World as planned. They also agreed to maintain the custody status quo.

The parties later attended a custody conciliation conference and entered an agreed order [on] May 27, 2015 under which terms they shared legal custody, Mother retained primary physical custody and Father had partial custody every other weekend from Thursday after school through Sunday evening and every other Thursday evening through Friday morning preceding Mother's custody weekends.

On December 12, 2014, Father filed a petition to seeking [*sic*] primary physical custody. The matter was assigned to the Hon[orable] Bernard Coates who held three days of hearings between May and July 2015. A final hearing was scheduled for October 2015, but Judge Coates passed away before the hearing could be held. The matter was re-assigned to [the Honorable Jeannine Turgeon] and [Judge Turgeon] held the final hearing [on] December 3, 2015[.]

Trial Court Opinion, 3/16/16, at 1-2 (footnote omitted).

Following the hearing, the trial court entered its December 3, 2015 order awarding primary physical custody of L.V. to Mother, awarding partial physical custody of L.V. to Father, and awarding both parents shared legal custody. During the school year, Father was awarded partial physical custody on Wednesday evenings and every other weekend from Friday after school until Monday before school. During the summer, Father was awarded three two-week periods of partial physical custody. On December 31, 2015, Father timely filed a notice of appeal along with a concise statement of errors complained of on appeal.

On January 4, 2016, the trial court entered an order granting reconsideration of the December 3, 2015 order.[1] In doing so, the trial court modified paragraph 6.f. of the order, relating to the parents' right of first refusal. The trial court did not modify any other provisions of the December 3, 2015 order. Father timely filed a notice of appeal from the January 4, 2016 order on February 3, 2016, along with an additional concise statement of errors complained of on appeal.[2]

On appeal, Father raises the following issues for our review.[3]

_____

[1] The record does not contain a motion for reconsideration, nor is a motion for reconsideration listed on the docket. In the January 4, 2016 order, the trial court stated that it received the motion via e-mail on December 29, 2015. The trial court further explained that it had jurisdiction to act on Father's motion, because the thirty day appeal period from the December 3, 2015 order ended on January 2, 2016, which was a Saturday, and because Monday, January 4, 2016, was the first business day following the expiration of the thirty-day appeal period.

[2] Father filed a praecipe to strike his previous appeal on January 22, 2016, pursuant to Rule 1701 of our Rules of Appellate Procedure. Rule 1701 provides as follows, in relevant part.

> A timely order granting reconsideration under this paragraph shall render inoperative any such notice of appeal or petition for review of a quasijudicial order theretofore or thereafter filed or docketed with respect to the prior order. The petitioning party shall and any party may file a praecipe with the prothonotary of any court in which such an inoperative notice or petition is filed or docketed and the prothonotary shall note on the docket that such notice or petition has been stricken under this rule.

Pa.R.A.P. 1701(b)(3).

[3] We have adjusted the formatting of Father's issues for clarity.

I. Did the trial court commit an abuse of discretion when it ignored material, relevant, and competent evidence proving Father's school district to be vastly superior to Mother's in terms of quality of education and safety?

II. Did the trial court commit an error of law when it took judicial notice *sua sponte* of its own opinion formed from some unknown, extrajudicial source?

III. Did the trial court commit an error of law when it made a finding of fact not supported by competent evidence based upon hearsay spoken by Mother during an investigation of her home and recorded in a CYS report which was not introduced into evidence, unseen by both counsel prior to the day of trial, and not subject to cross examination?

IV. Did the trial court commit a gross abuse of discretion by making a determination unreasonable in view of its factual findings with regard to its "best home" factor when it decided the factor in favor of Mother despite admonishing her regarding the unsafe condition of her home?

V. Did the trial court commit an error of law when it failed to interrogate [L.V.] based solely upon Father's counsel's refusal to waive the right to be present and to have a transcript of the interrogation produced?

VI. Did the trial court commit an error of law when it failed to address 23 Pa.C.S. § 5328(a)(8), attempt of a parent to turn the [c]hild against the other parent, despite considerable competent evidence weighing against Mother?

VII. Did the trial court abuse its discretion when it made conclusions contrary to competent evidence relating to [L.V.]'s best interests pursuant to the following custody factors that clearly favored Father[?]

> [1.] 23 Pa.C.S. § 5328(a)(1), which party is more likely to encourage and permit frequent

and continuing contact between the child and another party;

[2.] 23 Pa.C.S. § 5328(a)(3), the parental duties performed by each party on behalf of the child;

[3.] 23 Pa.C.S. § 5328(a)(4), the need for stability and continuity in the child's education, family life and community life;

[4.] 23 Pa.C.S. § 5328(a)(9), and [*sic*] which party is more likely to maintain a loving, stable, consistent and nurturing relationship with the child adequate for the child's emotional needs; and

[5.] 23 Pa.C.S. § 5328(a)(10), which party is more likely to attend to the daily physical, emotional, including [*sic*] developmental, educational and special needs of the child.

VIII. Did the trial court commit an error of law when it disregarded competent evidence relevant to the [c]hild's best interests pursuant to 23 Pa.C.S. § 5328(a)(5), the availability of extended family, including the preservation and nurturing of meaningful relationships with his Stepmother and Father's extended family?

Father's Brief at 5-7 (suggested answers omitted).

We consider these issues mindful of our well-settled standard of review.

In reviewing a custody order, our scope is of the broadest type and our standard is abuse of discretion. We must accept findings of the trial court that are supported by competent evidence of record, as our role does not include making independent factual determinations. In addition, with regard to issues of credibility and weight of the evidence, we must defer to the presiding trial judge who viewed

and assessed the witnesses first-hand. However, we are not bound by the trial court's deductions or inferences from its factual findings. Ultimately, the test is whether the trial court's conclusions are unreasonable as shown by the evidence of record. We may reject the conclusions of the trial court only if they involve an error of law, or are unreasonable in light of the sustainable findings of the trial court.

**V.B. v. J.E.B.**, 55 A.3d 1193, 1197 (Pa. Super. 2012) (citations omitted).

"When a trial court orders a form of custody, the best interest of the child is paramount." **S.W.D. v. S.A.R.**, 96 A.3d 396, 400 (Pa. Super. 2014) (citation omitted). The factors to be considered by a court when awarding custody are set forth at 23 Pa.C.S.A. § 5328(a).

**§ 5328. Factors to consider when awarding custody**

**(a) Factors.--**In ordering any form of custody, the court shall determine the best interest of the child by considering all relevant factors, giving weighted consideration to those factors which affect the safety of the child, including the following:

(1) Which party is more likely to encourage and permit frequent and continuing contact between the child and another party.

(2) The present and past abuse committed by a party or member of the party's household, whether there is a continued risk of harm to the child or an abused party and which party can better provide adequate physical safeguards and supervision of the child.

(2.1) The information set forth in section 5329.1(a) (relating to consideration of child abuse and involvement with protective services).

- 7 -

(3) The parental duties performed by each party on behalf of the child.

(4) The need for stability and continuity in the child's education, family life and community life.

(5) The availability of extended family.

(6) The child's sibling relationships.

(7) The well-reasoned preference of the child, based on the child's maturity and judgment.

(8) The attempts of a parent to turn the child against the other parent, except in cases of domestic violence where reasonable safety measures are necessary to protect the child from harm.

(9) Which party is more likely to maintain a loving, stable, consistent and nurturing relationship with the child adequate for the child's emotional needs.

(10) Which party is more likely to attend to the daily physical, emotional, developmental, educational and special needs of the child.

(11) The proximity of the residences of the parties.

(12) Each party's availability to care for the child or ability to make appropriate child-care arrangements.

(13) The level of conflict between the parties and the willingness and ability of the parties to cooperate with one another. A party's effort to protect a child from abuse by another party is not evidence of unwillingness or inability to cooperate with that party.

(14) The history of drug or alcohol abuse of a party or member of a party's household.

(15) The mental and physical condition of a party or member of a party's household.

(16) Any other relevant factor.

23 Pa.C.S.A. § 5328(a).

Instantly, the trial court announced its findings with respect to each of the Section 5328(a) factors at the conclusion of the custody hearing on December 3, 2015. N.T., 12/3/15, at 84-90. The trial court found that Sections 5328(a)(2), (2.1), (3), (4), and (6) weighed in favor of Mother, and that Section 5328(a)(14) weighed in favor of Father. *Id.* at 85-89. The court found that Sections 5328(a)(1), (5), (7), (8), (9), (10), (11), (12), and (13) did not weigh in favor of either parent. *Id.* at 84-88. With respect to Section 5328(a)(16), the trial court found that Father appears to have a wealthy family and a nice home, and that Mother's home is in poor condition. *Id.* at 89. The trial court noted that this caused Section 5328(a)(16) to weigh slightly in Father's favor, "although we are not to base custody issues on someone's wealth or the beauty of their home." *Id.* at 89-90. In concluding that primary physical custody of Child should remain with Mother, the trial court observed that L.V. has spent his entire life residing with Mother, that L.V. is doing well in his current school, and that L.V. has a strong relationship with his half-sister, who also resides in Mother's home. *Id.* at 85-87.

In his first issue, Father argues that the trial court abused its discretion by ignoring evidence that his school district is vastly superior to Mother's school district in terms of academic quality and safety. Father's Brief at 15-19. In his interrelated second issue, Father argues that the trial court improperly took judicial notice of facts regarding the school board in Mother's school district, and used those improperly noticed facts to ignore evidence relating to the superiority of the school that [L.V.] would attend if he lived primarily with Father. *Id.* at 19-22

On June 30, 2015, Father presented testimony concerning the relative quality of the Central Dauphin School District, where he resides, as compared to the Susquehanna Township School District, where Mother resides. *See*, *e.g.*, N.T., 6/30/15, at 10-19. Father testified that Paxtonia Elementary, in the Central Dauphin School District, scored much higher on a 2013-2014 school performance profile than did Thomas Holtzman Elementary, where L.V. currently attends. *Id.* at 11-13. Father further testified that safe school reports for Thomas Holtzman and Paxtonia indicate that Thomas Holtzman had 64 reported incidents of misconduct during the 2013-2014 school year, while Paxtonia had no reported incidents of misconduct. *Id.* at 15.

On December 3, 2015, Father's counsel conducted cross-examination of Mother concerning Facebook posts in which she made negative statements about Susquehanna Township. N.T., 12/3/15, at 28-30. As

cross-examination continued, the trial court interjected and stated, "[w]ell, I will take judicial notice that the school district in Susquehanna Township because of some bomb throwers on the school board has had an unbelievably horrible last five years," to which Father's counsel responded, "Okay." *Id.* at 30.

In its opinion, the trial court explained that it did not find Father's arguments concerning the quality of his school district to be persuasive. The trial court reasoned as follows.

> [L.V.'s] need for stability and continuity in his educational life would best be served by remaining at the school he was attending, in the school district he had been in since Kindergarten. The evidence indicated that [L.V.] has been doing extremely well in the third grade at Holtzman Elementary and had performed well on recent standardized testing. His IEP appears to have made a positive impact and his educational trajectory is in the right direction. Given his trajectory, a comparison of school profile grades was not relevant. As I noted during testimony, my consideration was about "the school and the teacher, not the school district."

Trial Court Opinion, 3/16/16, at 16-17 (citations to the record omitted).

Further, with respect to Father's claim that it improperly took judicial notice of certain facts, the trial court points out that Father did not object to its taking of judicial notice during the custody hearing, and that Father has therefore waived this claim for our review. *Id.* at 17. In the alternative, the trial court concludes that Father suffered no prejudice from this alleged error, because "I essentially agreed with the point Father's attorney was

trying to make through testimony, which was that the school district on the whole had been having great difficulties." ***Id.***

We conclude that the trial court did not abuse its discretion. While Father presented a great deal of evidence concerning the alleged inferiority of the Susquehanna Township School District, the trial court was free to weigh this evidence as it saw fit. Critically, the record supports the trial court's conclusion that L.V. is thriving in the third grade at his current elementary school. The record contains a copy of L.V.'s first quarter report card, which was entered into evidence as Plaintiff's Exhibit 17. ***See*** N.T., 12/3/15, at 55. L.V.'s report card indicates that he scored a ninety-eight in Reading for Comprehension, a 95 in Writing to Communicate, a 94 in Social Studies, and a 94 in Science. ***See*** Plaintiff's Exhibit 17. In addition, the report card indicates that L.V. scored a "1," meaning "Consistently demonstrates," in all four "S.O.A.R." categories, which relate to L.V.'s Safety, Ownership, Active Cooperation, and Respect. ***Id.*** It was reasonable for the trial court to conclude that L.V. should not change school districts when L.V. appears to be doing very well where he is.

Concerning Father's claim that the trial court erred by taking judicial notice of facts relating to the Susquehanna Township school board, we agree with the trial court that Father has waived this claim by failing to make a timely objection. It is well-settled that "[i]n order to preserve an issue for appellate review, a party must make a timely and specific objection at the

- 12 -

appropriate stage of the proceedings before the trial court. Failure to timely object to a basic and fundamental error will result in waiver of that issue." *See In re S.C.B.*, 990 A.2d 762, 767 (Pa. Super. 2010), *quoting Thompson v. Thompson*, 963 A.2d 474, 475–76 (Pa. Super. 2008). Therefore, Father's first and second issues merit no relief.

In his third issue, Father argues that the trial court erred by finding that he had been in a physical altercation with one of his previous girlfriends. Father's Brief at 22-24. Father contends that it was improper for the trial court to make this finding, because it was based solely on a hearsay statement contained in a child protective services report. *Id.*

In its opinion, the trial court explained that it was required pursuant to Section 5328(a)(2.1) to consider the information set forth in Section 5329.1(a) of the Child Custody Act, relating to consideration of child abuse and involvement with protective services. Trial Court Opinion, 3/16/16, at 17. In order to meet this requirement, the trial court requested a report from Dauphin County Children and Youth Services (CYS) detailing any involvement it may have had with L.V. *Id.* The report is contained in the certified record on appeal, and contains a description of an interview between Mother and a CYS caseworker on March 3, 2014. According to the report, Mother stated that Father "once choked her and dragged her out of the house. She also stated that she had been told by one of his ex[-

]girlfriends … that he had hit her as well." Consideration of Child Abuse and Involvement with Protective Services, at 4 (unnumbered pages).

At the conclusion of the custody hearing, the trial court made the following findings with respect to Sections 5328(a)(2) and (2.1).

> It looks like dad was in a physical altercation with a girlfriend but I am assuming that that was situational, … I will assume that that will not happen again and it's history and, therefore, there is not, I am not going to put a huge subtraction mark in [F]ather's column on that.

N.T., 12/3/15, at 85. The trial court further explained that Father's alleged altercation with his previous girlfriend was "an insignificant consideration in my custody determination." Trial Court Opinion, 3/16/16, at 18.

Initially, we note that Father has waived any challenge to the trial court's consideration of the CYS report, as he did not object or raise any concern with respect to the report during the custody proceedings. *See* *S.C.B.*, *supra* at 767. Further, even if we were to conclude that the trial court erred or abused its discretion by considering the report, the record still would support the trial court's finding that Father has a history of domestic violence. Mother testified on July 30, 2015, that she and Father became reacquainted in February 2012, and that they maintained a casual sexual relationship from about March 2012 until October 2012. N.T., 7/30/15, at 114-117. In October 2012, Mother discovered that Father was also seeing another woman, his current wife, A.M. (Stepmother). *Id.* at 116-117. Mother informed Father that she was ending their relationship, and Father

- 14 -

became upset. *Id.* at 117. Mother testified that Father "was physically violent towards me" as a result of this incident. *Id.* at 116.

Father's fourth issue is that the trial court abused its discretion when it found that Mother's home is "the best home" for Child. Father's Brief at 24-26. Father asserts that Mother's home is dirty, overcrowded, and dangerous, and that Father's home is much more appropriate. *Id.*

At the conclusion of the custody hearing, the trial court acknowledged that Mother's home suffers from numerous problems. *See* N.T., 12/3/15, at 84, 89. For example, the trial court acknowledged that Mother's home features "dogs with fleas" and an empty pool in the backyard which is filled with debris. *Id.* at 84. However, the trial court endeavored to address these issues by including several provisions within its December 3, 2015 custody order. The trial court instructed, among other things, that Mother must provide monthly flea treatments to all animals in her home, and that the empty pool in Mother's backyard must be "filled in or secured with a lock" within thirty days. Order of Court – Parenting Plan, 12/3/15, at 10. The trial court reiterated in its opinion that it fully considered the problems with Mother's home when making its custody decision, but that all of these problems can be remedied, and that it would be improper to award primary physical custody of L.V. to Father because he is wealthier or has a nicer house. Trial Court Opinion, 3/16/16, at 18. Thus, while the record supports Father's argument that Mother's home is in need of improvement, we

discern no abuse of discretion by the trial court in maintaining primary physical custody with Mother.

In his fifth issue, Father argues that the trial court abused its discretion by failing to interrogate L.V. during the custody proceedings. Father's Brief at 27-32. Father asserts that the trial court declined to interrogate L.V. based on the refusal of Father's counsel to waive his right to be present during the interrogation. *Id.* at 29-30. Father also contends that the trial court improperly concluded that his counsel had "interviewed and prepped" L.V. prior to the custody hearing, and that there is no evidence in the record to suggest that L.V. was "prepped." *Id.* at 30-32.

Father's argument stems from a discussion between the trial court and counsel during the final day of the custody hearing on December 3, 2015. At that time, counsel for Father made an oral motion that he be permitted to interrogate L.V. in the presence of the trial court, and that the trial court also conduct its own interrogation of L.V. N.T., 12/3/15, at 5. The trial court denied the motion, saying, "I decline to interview the child with counsel present. I don't put children through that and haven't for 23 years. So, no, thank you." *Id.* at 5-6.

In its opinion, the trial court explains that it was not required to conduct an interrogation of L.V. Trial Court Opinion, 3/16/16, at 18-19. The trial court directs our attention to Rule 1915.11(b) of our Rules of Civil Procedure, which provides as follows.

> (b) The court **may** interrogate a child, whether or not the subject of the action, in open court or in chambers. The interrogation shall be conducted in the presence of the attorneys and, if permitted by the court, the parties. The attorneys shall have the right to interrogate the child under the supervision of the court. The interrogation shall be part of the record.

Pa.R.C.P. 1915.11(b) (emphasis added).[4] The trial court also expressed concern that conducting an interrogation of L.V. would be potentially traumatic, because L.V. was "interviewed and prepped by Father's attorney prior to the custody hearing." Trial Court Opinion, 3/16/16, at 19.

As observed by the trial court, Rule 1915.11(b) makes interrogation of a child in a custody proceeding optional. The trial court was under no obligation to interrogate L.V., and its failure to do so does not constitute reversible error. In addition, we observe that the record supports the trial court's finding that L.V. had been interviewed and, to a certain extent, "prepped," prior to the custody proceedings. On May 5, 2015, Father's counsel provided a detailed offer of proof listing everything that L.V. would say if interrogated by the trial court. *See* N.T., 5/5/15, at 4-6. Father later acknowledged that he took L.V. to meet with his attorney. N.T., 7/30/15, at 64. Father admitted that he and L.V. discussed L.V.'s anticipated interrogation, because L.V. was "nervous," and Father wanted to calm him

_____

[4] Pa.R.C.P. 1915.15(b) was amended, effective July 1, 2016, and now provides that a court may "interview," rather than "interrogate," a child in a custody proceeding.

down. *Id.* at 63-64. Father stated that he has explained to L.V. that he is seeking primary physical custody in order to "give [L.V.] a better education, a better way of living, a better life[.]" *Id.* at 73. Similarly, Stepmother testified that she discussed the custody proceedings with L.V., and that "[w]e always stress to [L.V.] that he needs to be honest and that he needs to tell the truth and whatever he wants he needs to express that. He was worried that his mommy would get mad when he told her that he wants to stay with us more." N.T., 5/5/15, at 47-50. Given this testimony, we discern no abuse of discretion.

Father argues in his sixth issue that the trial court erred by failing to conclude that Mother has attempted to alienate L.V. from Father. Father's Brief at 32-35. Father emphasizes that Mother made L.V. read court transcripts, and that Mother revealed to L.V. that Father had entered pictures of his dirty underwear into evidence during court proceedings, which upset L.V. *Id.* at 33.

Father's claim relates to testimony presented by Stepmother on May 5, 2015. Stepmother testified that she picks L.V. up from school on Thursday afternoons, and that L.V. is "often in clothing that is too small for him, that's ill-fitting. It often has stains or is dirty or tattered." N.T., 5/5/15, at 29-30. In support of this claim, the trial court was presented with pictures of L.V.'s underwear, which were entered into evidence as Defendant's Exhibits 3-A and 3-B. Stepmother testified that "I take photographs of [L.V.'s]

- 18 -

underwear every Thursday when he comes …. This is just the exhibit that was selected."[5]  *Id.* at 38-39.  On July 30, 2015, Father testified that L.V. reported being forced by Mother to read transcripts of the custody proceedings, and that Mother informed L.V. that Father entered a picture of his underwear into evidence.  N.T., 7/30/15, at 71-73.  Father stated that his relationship with L.V. has worsened as a result of these events.  *Id.* at 73-74.

On December 3, 2015, Mother testified by way of an offer of proof that L.V. was exposed to the transcripts of the prior custody proceedings inadvertently.  Mother explained "that she was reading the transcript on her computer at home, went to the restroom, … and when she came back [L.V.] was sitting in front of the computer reading it.  She immediately pulled him away, realizing she should have closed the computer … before she went to the restroom."  N.T., 12/3/15, at 22.  In its opinion, the trial court accepted Mother's claim that she did not intentionally expose L.V. to the custody hearing transcripts.  Trial Court Opinion, 3/16/16, at 19.

---

[5] Father testified that he has taken only one picture of L.V.'s underwear, and that "[w]e check him every Thursday but we don't take photographs."  N.T., 7/30/15, at 82, 90-91.  When confronted with Stepmother's prior testimony that she takes pictures of L.V.'s underwear "every Thursday when he comes," Father stated, "I don't think she meant every Thursday.  I mean, there have been occasions probably taking them and sending them to [Mother] but nothing -- this is the only one that I know of."  *Id.* at 93.

We again conclude that Father is not entitled to relief. It was within the trial court's discretion to accept Mother's explanation that L.V. had been exposed to the custody transcripts inadvertently, and to reject Father's assertion that Mother was attempting to turn L.V. against Father by forcing him to read the transcripts. In his brief, Father suggests that we should reject the trial court's credibility finding, because it is implausible that L.V. would be able to read and understand the transcripts. *See* Father's Brief at 30 n.9. However, the record does not support Father's claim that L.V.'s reading skills are so limited that he would be unable to understand a court transcript. As noted in connection with Father's first argument, L.V. scored a ninety-eight in Reading for Comprehension on his most recent report card. *See* Plaintiff's Exhibit 17. Father testified that L.V. is "a good reader" with some comprehension issues, and that they recently read through a two hundred thirty-eight page book together. N.T., 7/30/15, at 49-50; N.T., 6/30/15, at 32.

In his seventh issue on appeal, Father challenges the trial court's findings with respect to Sections 5328(a)(1), (3), (4), (9), and (10). Father's Brief at 35-51. Father alleges, among other things, that Mother refuses to cooperate with Father, that Mother neglects L.V., that Father resides in a better community and provides L.V. with superior academic assistance, and that the record does not support the trial court's belief that L.V. is doing well in his current school. *Id.* at 37-50.

We conclude that these claims are meritless. Father's allegation that Mother is uncooperative relates primarily to a 2014 incident, described in the trial court's summary of facts, during which Mother filed an emergency petition in an effort to prevent Father from taking L.V. to Disney World. The trial court acknowledged at the conclusion of the custody hearing that "it was wrong not to let the child go." N.T., 12/3/15, at 85. Clearly, the trial court was aware of the Disney World incident when making its custody decision, and it was for the trial court, not this Court, to weigh the significance of that event.

Concerning Father's claim that Mother neglects L.V., Father alleged during the custody proceedings that L.V. is mistreated by Mother in a variety of ways. For example, Father emphasizes in his brief that Mother "neglected to address a serious dental issue for several months, as [L.V.] suffered from a dead tooth and teasing at school which resulted from it." Father's Brief at 49. As is the case with many of Father's other allegations, evidence was presented during the custody proceedings to rebut Father's description of events. Mother testified that L.V. did not have a "dead tooth," but that he had a discolored baby tooth that "is holding on for whatever reason and the adult tooth is growing in behind it." N.T., 7/30/15, at 128. According to Mother, she discussed this tooth with L.V.'s dentist, who instructed her that the tooth should not be pulled, because "that entails putting L.V. to sleep for

something that is unnecessary. The tooth with fall out on its own." *Id.* at 128-29.

Finally, we reject Father's claims that the trial court was obligated to award him primary physical custody because he lives in a nicer community and can provide L.V. with a better education. As discussed above, L.V. has resided his entire life with Mother. The record supports the trial court's finding that L.V. is doing well in his current school, and that L.V. is bonded with his half-sister, who also resides in Mother's home. It was not an abuse of discretion for the trial court to conclude that these considerations outweighed Father's educational concerns, and that L.V.'s best interest would be served by allowing him to remain in Mother's primary physical custody.

Father argues in his eighth issue that the trial court abused its discretion by failing to conclude that Section 5328(a)(5) should weigh in favor of Father, because L.V. has a beneficial relationship with Father's extended family, and because there was no evidence that would suggest that L.V. has an equally beneficial relationship with Mother's extended family. Father's Brief at 51-54.

At the conclusion of the custody hearing, the trial court found that Section 5328(a)(5) did not weigh in favor of either parent, because both Father and Mother have extended family in the area. N.T., 12/3/15, at 86-87. The trial court stated that Section 5328(a)(5) "does not require, as

Father suggests, a comparison of the relative superiority of each parent's extended family …. Even were this an appropriate factor, my finding would have been the same." Trial Court Opinion, 3/16/16, at 22.

We conclude once again that the trial court did not abuse its discretion. While testimony was presented concerning L.V.'s positive relationship with Father's extended family, the trial court was free to conclude that the testimony was exaggerated, or to reject the testimony in its entirety. Indeed, it would be logical for the trial court to infer that L.V.'s relationship with Father's extended family would be somewhat limited, given that L.V. did not see any of these family members for roughly the first five years of his life. Meanwhile, L.V. has spent his entire life residing with members of Mother's extended family. Specifically, Mother, L.V., and L.V.'s half-sister share a home with L.V.'s maternal grandparents, as well as L.V.'s uncle and cousin. N.T., 12/3/15, at 12.

Based on the foregoing, we conclude that the trial court did not abuse its discretion by awarding primary physical custody of L.V. to Mother, and awarding partial physical custody to Father. **See V.B.**, **supra**. Accordingly, we affirm the trial court's January 4, 2016 order.

Order affirmed.

Judgment Entered.

_____

Joseph D. Seletyn, Esq.
Prothonotary


Date: 7/20/2016